(June 18, 1987)

■ INTEGRATED LOGISTICS CONSULTANTS, Appellant, v FIDATA CORPORATION et al., Respondents.—Order, Supreme Court, New York County (Alfred M. Ascione, J.), entered February 5, 1986, denying plaintiff's motion for summary judgment on liability and granting defendants' cross motion to amend the answer to interpose a counterclaim to recover, *inter alia,* for unjust enrichment, conversion, constructive trust and fraud

and misrepresentation, affirmed, without costs or disbursements.

Contrary to the view expressed by our dissenting colleague, we find the record replete with factual inconsistencies and critical disputes which, in our view, cannot be finally resolved on the conflicting affidavits and proof adduced on the motion for summary judgment. While defendants concede that plaintiff's registration of Health Insurance Association of America (HIAA) was accepted and retained and that plaintiff has been paid substantial commissions in the past, these admissions are not conclusive in light of the claims of fraud and misrepresentation raised in the amended answer.

Plaintiff's president, George Pagonis, alleges that it was he who "registered" HIAA as a client of defendants' predecessor, Bradford National Computer Services, Inc. (Bradford). This is supported by the "statement" of Dominick Ciminello, who had been vice-president of corporate systems at Bradford and who states that he did not register HIAA as a Bradford account, although he did "handle" the account subsequently. The Bradford client registration form for HIAA, filed by Pagonis, lists his "contacts" at HIAA as Donald Jones and George Wells.

However, Donald Jones, who had been HIAA's director of statistics and manager of prevailing health care charges system, denied any knowledge of either plaintiff or Pagonis. In an affidavit sworn to November 25, 1985, he states: "Mr. Pagonis had no role to the best of my knowledge in bringing the HIAA business to Bradford" and, in a subsequent affidavit sworn to January 6, 1986, he reiterated this, stating that "the individual who was responsible for bringing the HIAA contract to Bradford was Dominick Ciminello." Similarly, George Wells, HIAA's director of company relations and membership, in an affidavit sworn to November 25, 1985, challenges Pagonis' listing of Wells as one of his "contacts", since he (Wells) did not have "any responsibility for the data processing contract between HIAA and Bradford", adding, "this is not an area of my responsibility." Thus, both persons listed by Pagonis on the filed Bradford client registration form sharply dispute whether he was actually responsible for securing the HIAA contract. This is a critical issue in relation to the fraud and misrepresentation claims placed in issue by defendants. The mere fact that plaintiff received payment does not mean that it was properly disbursed or earned, as assumed by the dissent.

Under the circumstances, the conflicting claims presented on this record clearly do not permit summary disposition and

must await final resolution at trial. While plaintiff and the dissent place great emphasis upon Ciminello's statements that it was Pagonis and not he who was responsible for bringing HIAA to Bradford, Ciminello's credibility cannot be determined at this point on the basis of the conflicting affidavits in this record. This is especially so, when we take into account Ciminello's present business association. He is now employed by Litton Industries, successor in interest to Infomatics, and he recently attempted to solicit the HIAA account for Litton. Ciminello worked for Infomatics before joining defendants' predecessor, Bradford and, as stated, he serviced the HIAA account before HIAA switched to Bradford.

Considering these and other factors, the drastic relief of summary judgment is inappropriate here, particularly bearing in mind the limited function of the court on such a motion as issue finding, not issue determination *(Cruz v American Export Lines,* 67 NY2d 1, 13; *Sillman v Twentieth Century-Fox Film Corp.,* 3 NY2d 395, 404). Summary judgment relief should not be granted where there is any doubt as to the existence of a triable issue *(Moskowitz v Garlock,* 23 AD2d 943, 944), or where the issue is even arguable *(Barrett v Jacobs,* 255 NY 520, 522), since it serves to deprive a party of his day in court.

This is especially so where, as here, there are salient facts within the knowledge and control of the movant which may be revealed through pretrial disclosure proceedings *(see,* CPLR 3212 [f]; *Terranova v Emil,* 20 NY2d 493, 497; *Simpson v Term Indus.,* 126 AD2d 484; *Mack v Gregory Mem. Hosp.,* 90 AD2d 969; *Bank Leumi Trust Co. v Felner,* 70 AD2d 869). In this case, there has been no discovery since the motion for summary judgment was made slightly more than one month after joinder of issue. Concur—Kassal, Ellerin and Wallach, JJ.

Murphy, P. J., dissents in a memorandum as follows: In May 1982, plaintiff entered into a marketing agent agreement with Bradford National Computer Services, Inc., defendant Fidata Corporation's predecessor. Pursuant thereto, plaintiff was appointed Bradford's agent for the purpose of marketing Bradford's computer-related services. The agreement provided that plaintiff would function as an independent contractor and that its compensation would consist exclusively of commissions. To earn a commission plaintiff was required first to register a prospect with Bradford. "Prospect" is defined in the agreement as "Any person, including any legal entity, contacted *or proposed to be contacted* by the Agent for the purpose of selling to such person services hereunder." (Emphasis added.) Once a prospect was registered, plaintiff agreed to

use its "best efforts" to solicit the prospect's purchase of services from Bradford. In exchange, plaintiff was accorded the exclusive right to solicit the prospect and Bradford promised that during the term of the agreement it would "not solicit nor enter into a Client Service Agreement with a Registered Prospect * * * unless commissions are payable to the Agent as provided in Article 8 hereof or unless given the Agent's written consent." Article 8 of the agreement provided that commissions were to be paid the agent within 30 days of Bradford's receipt from a registered client of payment, and were to amount to the difference between the amount paid by the client and the wholesale price of the services purchased.

In light of the exclusivity of plaintiff's right to solicit prospects registered by it, the agreement accorded Bradford unlimited discretion to determine whether to accept client registration forms submitted by plaintiff. And, after a client registration form had been accepted by Bradford, Bradford retained broad powers to monitor plaintiff's solicitation efforts and in certain circumstances to terminate the registration. Thus, Bradford was entitled to monthly marketing reports from plaintiff and if, at Bradford's sole discretion, plaintiff was not using reasonable efforts to make a registered prospect into a Bradford client, Bradford was empowered to cancel the registration on 30 days' written notice. Bradford was also entitled to cancel a registration if, after six months and a solicitation expenditure of less than $5,000, no purchase of Bradford's services was effectuated.

Although plaintiff was required to use its "best efforts" to solicit its registered prospects to become Bradford clients, it is important to note that the marketing agreement prohibited plaintiff from making any warranties or representations as to Bradford's services and forbade plaintiff from incurring any contractual obligations on Bradford's behalf. In recognition of these limitations on the scope of plaintiff's agency powers, the agreement provided that Bradford would support its marketing efforts where appropriate by (1) informing plaintiff's registered prospects concerning the services offered; (2) demonstrating Bradford's data center to registered prospects; and (3) assisting plaintiff in closing contracts with its registered prospects.

It is undisputed that on May 9, 1983, George Pagonis, plaintiff's president, registered the Health Insurance Association of American (HIAA) with Bradford as a prospect. As Vincent J. Iuzzolino, Bradford's then director of sales, explains in his affidavit, following acceptance of the HIAA registration,

it was decided to assign the account to a Bradford employee named Dominick Ciminello to develop. Ciminello was selected to "nurture" the HIAA account because before coming to work at Bradford he had been employed by a firm known as Infomatics, which had at that time been retained by HIAA to provide it with data processing services. While at Infomatics, Ciminello had become well acquainted with HIAA's data processing needs and had developed contacts which it was thought would be helpful in luring the HIAA account to Bradford.

It appears that Ciminello was primarily responsible for negotiating the service contract eventually entered into between Bradford and HIAA, and that Pagonis played a secondary role, consulting with Ciminello as to the pricing of the Bradford proposal, but not dealing directly with HIAA. This arrangement was evidently well known and entirely unobjectionable to Bradford. Indeed, Vincent Iuzzolino states in his completely uncontradicted affidavit, that during his tenure as Bradford's director of sales, which included the events here at issue, it was a common practice to assign leads brought in by marketing agents to in-house personnel for development and that the agent, although relegated to the background, was still considered entitled to his commission if the registered prospect became a Bradford client. That this was in fact Bradford's practice is well illustrated by the present case.

It is clear that plaintiff and Bradford understood from the outset that Ciminello would handle the HIAA account. The client registration card filed by Pagonis on May 9, 1983 states "CIMINELLO—Handle for now—we [plaintiff] will report to you." The Iuzzolino affidavit, of course, confirms that this was the understanding. Bradford's awareness that the HIAA account was being handled in house is further demonstrated by a letter from Ray Anderson, Bradford's director of marketing, to George Pagonis, dated February 1, 1984. The letter requests information as to the status of certain registrations, among them HIAA, that are listed as inactive and are consequently being considered for termination. Attached to the letter is a computer printout generated by Bradford with the following entry respecting the HIAA account: "Ciminello to handle." In his reply to Anderson, Pagonis requests that the HIAA registration be kept active, noting specifically that HIAA was a "Home Contract". Thereafter, plaintiff's HIAA registration was retained by Bradford despite the account's purported inactivity, and with the knowledge that it was being handled in house by Ciminello.

The Anderson inquiry notwithstanding, it became clear by October 1983 that Ciminello's negotiations with HIAA would shortly result in a service contract. Apparently aware that plaintiff had not taken part directly in the negotiations, Bradford's then president, David Williams, wrote Pagonis on October 27, 1983 indicating that an agreement was anticipated within 60 days and confirming that, assuming all went as expected, plaintiff would be entitled to commissions estimated as amounting to about $35,000 in 1984. A second letter from Williams to Pagonis, dated November 8, 1983, reiterates that upon Bradford's receipt of payment from HIAA pursuant to a finalized contract, plaintiff would receive commissions.

A service contract between Bradford and HIAA was finally entered into in February 1984. Thereafter, plaintiff was paid the commissions owing pursuant to the marketing agent agreement, which commissions were computed as provided in article 8 thereof. Bradford continued paying the commissions with full knowledge that it was Ciminello who negotiated the HIAA contract. Ciminello's May 1984 performance appraisal by Bradford cites the direct negotiation of the HIAA contract as one of Ciminello's major achievements.

In September 1984, plaintiff, whose commissions had been exceeding Bradford's net revenues from the HIAA account, agreed, at Bradford's request, to a new formula for commission computation which would assure that plaintiff's commissions never exceeded Bradford's net revenues. As consideration for plaintiff's concession, the September 11, 1984 letter documenting the parties' understanding provided: "It is agreed that Bradford will not cancel or change this commission arrangement for as long as HIAA processes at Bradford. Accordingly, this letter, if accepted, will be an integral part of the BNCS/ILC Master Agreement [the marketing agent agreement] and not withstanding any part of the Master Agreement, this portion is noncancellable."

Commissions were continued as provided in the September 11, 1984 letter agreement until April 1985 when they were abruptly stopped. A rather cryptic Fidata interoffice memo dated April 4, 1985 indicates that payments to George Pagonis respecting the HIAA account should cease. Strangely, the same memo states "There are, however, no accusations of wrongdoing by Mr. Pagonis."

Plaintiff commenced the present action to recover the commissions allegedly owing on the HIAA account pursuant to its modified marketing agent agreement by summons and com-

plaint dated August 21, 1985. Defendant interposed an answer dated September 24, 1985, admitting, *inter alia,* that Bradford and plaintiff entered into the May 1982 marketing agent agreement; that the parties also entered into the September 11, 1984 letter agreement modifying the marketing agent agreement; that both before and after execution of the September 11, 1984 letter agreement and until April 1985, commissions were paid to plaintiff on revenues received pursuant to the HIAA service contract with Bradford, the existence of which was also admitted. Defendant did not allege any facts in its answer which, if proven, would justify its discontinuance of commission payment; it raised as affirmative defenses only lack of personal and subject matter jurisdiction and that plaintiff had failed to state a cause of action.

Not surprisingly, plaintiff moved for summary judgment. Defendant opposed the summary judgment motion and cross-moved for permission to amend its answer pursuant to CPLR 3025 (b) to assert new-found counterclaims sounding in fraud, unjust enrichment, and conversion, and to request the imposition of a constructive trust upon the commissions paid plaintiff as well as an assessment of punitive damages.

As defendant acknowledges in its brief, its counterclaims, and indeed its defense of this action, are based essentially on its contention that it was fraudulently induced to pay plaintiff commissions which it would not otherwise have paid pursuant to the marketing agent agreement. The proposed amended answer conclusively alleges only two misrepresentations made by plaintiff upon which defendant claims it relied in paying out commissions: (1) that plaintiff introduced HIAA to Bradford, and (2) that plaintiff was responsible for securing the HIAA service contract for Bradford. The record contains neither documentary evidence of such misrepresentations nor an affidavit of anyone in defendant's employ to whom they were made. Assuming, arguendo, that the bare allegations in defendant's proposed amended pleading state a claim for fraud —a very generous assumption given the special pleading requirements applicable where fraud is concerned *(see, e.g., RCA Corp. v American Stds. Testing Bur.,* 121 AD2d 890; *Hogan & Co. v Saturn Mgt.,* 78 AD2d 837; CPLR 3016 [b])—it would appear clear that defendant's allegations are conclusively refuted by the evidence submitted by plaintiff in support of its summary judgment motion.

As detailed above, defendant was aware from the time it accepted plaintiff's registration of HIAA that the account would be handled by Ciminello. While unquestionably cogni-

zant of Ciminello's dominant role in procuring the HIAA contract, defendant took no action to terminate plaintiff's registration. To the contrary, defendant's president kept plaintiff apprised of the progress of the HIAA negotiations and at the same time repeatedly reaffirmed plaintiff's right to collect commissions. Once the HIAA contract was finalized, defendant with full knowledge of plaintiff's very limited role in procuring HIAA as a client, paid out substantial commissions and, eventually, in the noncancelable September 11, 1984 letter agreement, obligated itself to pay plaintiff commissions for as long as HIAA continued to process at Bradford. On this record defendant's claim that it was somehow misled into paying plaintiff commissions in reliance upon plaintiff's misrepresentation of its role in negotiating the HIAA contract is, in my view, untenable.

Defendant places great emphasis upon the affidavit of Donald Jones who negotiated with Bradford on behalf of HIAA. Jones states that he had no contact with Pagonis until well after the February 1984 HIAA service contract had been finalized. Jones' perception of Pagonis' role in the HIAA contract negotiations is, however, irrelevant to plaintiff's right to commissions under the marketing agent agreement. Having accepted plaintiff's registration of HIAA as a prospect, defendant agreed that plaintiff was to have the exclusive right to solicit HIAA's business for Bradford. While this would have ordinarily obligated plaintiff to use its best efforts to actively solicit HIAA, here a decision was made mutually by plaintiff and Bradford that the HIAA account would be handled by Bradford's employee, Ciminello, because of his prior experience with HIAA while at Infomatics. Notwithstanding this decision and the very secondary role to which it relegated plaintiff, and with full knowledge that it was Ciminello who was actually conducting the HIAA negotiations on Bradford's behalf, defendant retained plaintiff's registration of HIAA. Thus, when defendant and HIAA eventually entered into a service contract, and when defendant received revenues thereunder, plaintiff became entitled to, and in fact, received commissions, pursuant to section 7.3 of the marketing agent agreement which provides: "7.3. Subject to section 7.2, and during the term of this Agreement, the Agent shall have the exclusive right to solicit any of its Registered Prospects to purchase Services hereunder and Bradford will not solicit nor enter into a Client Service Agreement, with a Registered Prospect hereunder, unless commissions are payable to the Agent as provided in Article 8 hereof or unless given the Agent's written consent."

Having voluntarily assumed the agent's function while at the same time retaining the agent's registration, defendant cannot now claim that the agent has forfeited its right to commissions because it did not employ its "best efforts". Clearly, plaintiff was not required to use its "best efforts" to solicit HIAA when the exclusivity of its right of solicitation was compromised by defendant based upon defendant's considered judgment that its interests would thereby be best served.

If there is any lingering doubt as to plaintiff's right to the commissions it now seeks, it should be dispelled by the September 11, 1984 letter agreement making the commission arrangement stipulated therein noncancelable "notwithstanding any part of the Master Agreement". As there is absolutely no evidence that the September 11, 1984 agreement was fraudulently induced, and, indeed, plaintiff has demonstrated persuasively that it was made by Bradford completely aware of plaintiff's limited role regarding the HIAA account, the "best efforts" issue is effectively foreclosed.

Just as defendant's April 1985 discontinuance of plaintiff's commissions was entirely unsupported by any allegations, much less proof, of wrongdoing by Pagonis, so its present bare and belatedly raised allegations of fraud for which there is not the slightest evidentiary support betray what is, in essence, nothing more than a rather obvious attempt to avoid a clear and otherwise admitted contractual obligation. This should not be countenanced. Even at this early stage in the litigation, defendant is required to make some evidentiary showing raising a triable issue as to plaintiff's contractual claim, if summary judgment is to be avoided (see, Sutton v East Riv. Sav. Bank, 55 NY2d 550; Zuckerman v City of New York, 49 NY2d 557). As defendant has wholly failed in this regard, I see no ground for denying plaintiff's motion. Certainly, the shadowy speculations of defendant's counsel as to a possible conspiracy between Ciminello and Pagonis to defraud Bradford do not furnish a basis for sustaining the action. (RCA Corp. v American Stds. Testing Bur., supra; Zuckerman v City of New York, supra.)

Accordingly, I dissent and would grant plaintiff's motion for summary judgment and deny the cross motion by defendant for leave to amend its answer to assert the above-mentioned counterclaims. (See, East Asiatic Co. v Corash, 34 AD2d 432; Probst v Einstein Med. Center, 82 AD2d 739; Walden v Nowinski, 63 AD2d 586.)